## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* : <br> STATE OF GEORGIA *ex rel.* : <br> : <br> RICHARD BARKER., : <br> : <br>     Plaintiff/Relator : <br> : <br>     v. : <br> : <br> : <br> COLUMBUS REGIONAL HEALTHCARE : <br> SYSTEM, THE MEDICAL CENTER, : <br> JOHN B. AMOS CANCER CENTER, : <br> REGIONAL ONCOLOGY, LLC., : <br> and : <br> ANDREW W. PIPPAS, M.D. : <br> : <br>     Defendants. : <br> : | Civil Action No. 4-14-cv-304 (CDL) <br><br> **FILED UNDER SEAL** <br> pursuant to <br> 31 U.S.C. § 3729 *et seq.* |

## COMPLAINT

Plaintiff/Relator-Plaintiff Richard Barker, by and through undersigned counsel, brings this False Claims Act Complaint, on behalf of the United States of America and the State of Georgia, against Defendants Columbus Regional Healthcare System ("CRHS"), The Medical Center ("TMC"), the John B. Amos Cancer Center ("JBACC"),  Regional Oncology, LLC ("RO") and Andrew W. Pippas, M.D. (collectively "the Defendants").  This action is brought by plaintiff to recover civil penalties and treble damages under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 and the Georgia False Medicaid Claims Act (the

"GAFMCA"), GA. CODE ANN. § 49-4-168.1.

## INTRODUCTION

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of Georgia arising from false and/or fraudulent statements, records and claims made, or caused to be made, by the Defendants and/or their agents and employees.

2.      This *qui tam* case is brought against the Defendants for submitting and/or causing the submission of false claims by knowingly submitting reimbursement claims to Medicare, 42 U.S.C. § 1395 *et seq.*, and Medicaid, 42 U.S.C. § 1396 *et seq.* (hereinafter collectively referred to as "Federal Healthcare Programs") for claims that were in violation of the Stark Law and the Anti-kickback Statute.

## JURISDICTION AND VENUE

3.      This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732, including state law claims under 31 U.S.C. § 3732(b).  This court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendants transact business and have committed acts in violation of 31 U.S.C. § 3729 in this district.

## THE PARTIES

5.      Plaintiff/Relator Richard Barker ("Plaintiff/Relator") is an adult citizen and resident of the State of Georgia.  Plaintiff/Relator was, from September 26, 2011 to October 2013, Administrative Director of the JBACC.  In that position, Mr. Barker oversaw day-to-day operations of the medical and radiation oncology, integrative medicine, pharmacy, front office and business offices services and facilities.  Mr. Barker has twenty years experience in oncology medicine practice administration, including extensive experience with billing and reimbursement. Before working for CRHS, in his prior position, with Cancer Care Partners in Mishawaka, Indiana, he served as the compliance officer for the practice, managed all quality assurance and performance improvement projects and was responsible for the entire billing process.  Mr. Barker has been periodically trained and updated on proper billing procedures, and regularly reviews Medicare and Medicaid bulletins.  Mr. Barker has independent knowledge of all of the allegations against the Defendant and is the original source of the allegations contained in this Complaint. Before filing this Complaint, Mr. Barker made a disclosure of all

3

material evidence and information in his possession to the Government as required by 31 U.S.C. § 3730(b)(2).

6.    Defendant CRHS is a non-profit, health care system serving communities in Alabama and Georgia. CRHS owns two acute care hospitals, both located within Columbus, Georgia, The Medical Center ("TMC") and the Doctor's Hospital, which is not a defendant in this action. CRHS's corporate office and principal place of business is located at 707 Center Street, Columbus, Georgia.

7.    TMC is an acute care hospital with its principal place of business at 710 Center Street, Columbus, Georgia.

8.    The John B. Amos Cancer Center ("JBACC") is operated by CRHS as an outpatient department of TMC, but is physically separate from TMC. JBACC facilities are located at 1831 5th Avenue, Columbus, Georgia.

9.    Andrew W. Pippas, M.D. is a medical oncologist who is employed by CRHS and serves as the Medical Director of the John B. Amos Cancer Center. Dr. Pippas has been so employed since at least 2003.

10.    All of the medical oncologists employed by and providing services at JBACC, including Dr. Pippas, are employed by Regional Oncology, LLC ("RO"). RO has its principal place of business at 1831 5th Avenue, Columbus, Georgia.

## STATUTORY AND REGULATORY FRAMEWORK

### I.    The Federal False Claims Act

11.    The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties which range between $5,500 and $11,000 per claim.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b).  "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA.  *Id.*

## II.    The Georgia False Medicaid Claims Act

12.    The GAFMCA provides that any person who knowingly makes or causes to be made any false statement or representation of a material fact for use in determining right to a payment from the Georgia Medicaid Program is liable for a civil penalty of between five thousand five hundred dollars ($5,500) and eleven thousand dollars ($11,000) for each violation, plus three (3) times the amount of all payments judicially found to have been fraudulently received from Medicaid, or its fiscal agents because of the act of that person.  GA. CODE. ANN. § 49-4-168.1.  The

GAFMCA defines "knowingly" to mean that a person "has actual knowledge of the information or acts in deliberate ignorance or reckless disregard of the truth or falsity of the information." GA. CODE. ANN. § 49-4-168.

## III.   Federal Healthcare Programs

### A. Medicare

13.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program.  The Medicare program is a federally operated and funded program.  It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

14.     As relevant here, Part A of the Medicare Program authorizes payment for covered institutional care, including hospital, skilled nursing facility and home health care.  *See* 42 U.S.C. §§ 1395c-1395i-4.  Part B of the Medicare Program authorizes payment for, among other things, outpatient hospital services.  42 U.S.C. §§ 1395k(a), 1395l(t).

15.     The Medicare program is comprised of four parts, but only Medicare Parts A and B are relevant in this action.  Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of

the fee schedule amount of physician and laboratory services. 42 U.S.C. §§ 1395k, 1395l, 1395x(s).

**B. Medicaid**

16.     Medicaid is a joint federal-state program that provides health care benefits for certain groups; primarily the poor and disabled.  Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided, under what conditions.  CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.  The federal government provides a portion of each state's Medicaid funding.   The portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  In Georgia, the rate in effect from October 1, 2011 through September 30, 2012, for example, was 66 % (*i.e.*, the federal government contributed 66% of Medicaid expenses incurred by Georgia).  Medicaid also covers fees for professional services and inpatient and outpatient hospital services.

**C.  The Stark Statute**

17.     The Stark Statute prohibits a physician from referring Medicare patients for certain "designated health services" ("DHS") to an entity with which he has a "financial relationship", unless an exception applies.   42 U.S.C. §

1395nn(a)(1)(A).  The purpose of the statute is to reduce excess costs incurred by the Medicare program due to overutilization of services, anti-competitive behavior, and the corruption of medical judgment caused by physicians' financial self-interests.

18.    The Stark Statute defines DHS to include inpatient and outpatient hospital services. *Id.* § 1395nn(h)(6).  Radiation therapy services and supplies are also defined as a DHS. *Id.* § 1395nn(h)(6)   The statute broadly defines "financial relationship" to include physician compensation arrangements, as well as ownership and investment interests. *Id.* 1395nn(a)(2).  The Stark Statute applies to both direct and indirect financial relationships.  42 C.F.R. § 411.354.  Financial relationships between physicians and entities such as CRHS, TMC and JBACC that result in the referrals of DHS are prohibited unless the relationships fall within a statutory exception.

19.    Stark provides a statutory exception for "bona fide" employment relationships between entities, like hospitals, that bill for DHS and physicians.  The bona fide employment exception applies only if the amount of remuneration under the employment agreement is consistent with the fair market value of the services, is not determined directly or indirectly by taking into account the volume or value of any referrals by the employed physician and the remuneration is commercially

8

reasonable even if no referrals were made to the employer by the employed physician. 42 U.S.C. § 1395nn(e)(2).

20.    In addition to prohibiting certain physician referrals, the Stark Statute prohibits an entity receiving a referral from a person or entity with which it has a financial relationship from presenting or causing to be presented to Medicare any claim for DHS provided as a result of that referral.  42 U.S.C. § 1395nn(a)(1)(B). The statute prohibits a physician or other person from presenting or causing to be presented a claim for DHS that the physician knows or should know is for an item or service that is not payable under the statute. *Id.* § 1395nn(g)(3).

21.    FMV is based upon work that is personally performed by the employed physician.  Physicians may not be paid based upon work they do not personally perform, or based upon the volume or value of referrals.  Under Stark, FMV is defined "the value in arms length transactions, consistent with the general market value . . ." 42 U.S.C. Section 1395nn(h)(3).  Regulations promulgated by CMS further define FMV as "the value in arm's length transactions, consistent with the general market value."  "General market value" means "the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other entity."  According to CMS regulations, the Fair Market Value for any

9

transaction must be set "on the date of acquisition of the asset or at the time of the service agreement."  73 Fed. Reg. 48434, 48703 (August 19, 2008).

### D. The Anti-kickback Statute

22.    The federal Anti-Kickback Statute ("AKS") prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of federal health care business.  The AKS prohibits the offer or payment of "anything of value" in return for referrals.  A "thing of value" is defined broadly to include payment in cash or kind.  The AKS extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals.  Under the AKS both criminal and civil penalties apply, including civil monetary penalties, and the sanction of exclusion from federal health benefit programs.  The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization, affect medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.

23.    In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare any claim for referrals that are induced by kickbacks. In 2010 the AKS was amended to provide that a claim that includes items or

services resulting from kickback violations are deemed "false" under the FCA.  42 U.S.C. § 1320a-7b(g).

24.   The AKS has statutory and regulatory "Safe Harbors" that identify specific arrangements that do not violate the statute if all terms of the Safe Harbors are observed by the parties.   There is a "Safe Harbor" for employment, which provides that "as used in section 1128b of the Act . . . 'remuneration' does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs." 42 C.F.R. § 1001.952(i).  CMS and the courts interpret this provision to limit compensation to employed physicians to amounts that are commercially reasonable and at FMV as that term is defined in the Stark regulations.

## STATEMENT OF FACTS

25.   JBACC has five medical oncologists: Wilbur Bassett Jr., M.D., Peter Jiang, M.D., Wendy Mahone Johnson, M.D., Suresh Nukala, M.D., and Andrew Pippas, M.D.   Medical oncologists specialize in diagnosing and treating cancer using chemotherapy, hormonal therapy, biological therapy, and targeted therapy. They often are the main health care provider for someone who has cancer. Dr. Pippas serves as the Medical Director of JBACC and also serves as the Medical

Director of JBACC's clinical research program.  Dr. Bassett serves as the Medical Director for Clinical Laboratory Services at JBACC.  In addition to the medical direction services provided by Dr. Pippas and Dr. Bassett, the Defendants also employ a "Medical Director" for the Radiation Oncology Department of the JBACC, Douglas F. Ciuba, who is one of three physicians who own or are employed by Radiation Oncology of Columbus ("ROC").  Dr. Pawloski, a haematologist, also serves as a Medical Director at JBACC.  Of the seven or eight oncologists employed by or under contract with JBACC, half of them serve as "medical directors" and are separately paid stipends for those services.

26.    Dr. Pippas has been employed by JBACC since at least 2003, and has served as medical director of JBACC during that entire time.  From at least 2003 to March, 2009, Dr. Pippas worked without a written agreement of any kind.  In March, 2009, CRHS and Dr. Pippas entered into an employment agreement.  Under that agreement, Dr. Pippas is paid by CRHS/JBACC based upon a compensation system that depends upon the number of patients he supposedly sees personally and the revenue generated from those patient visits.  Dr. Pippas' base pay is determined by the number of work RVUs ("wRVU") (RVU stands for "relative value unit" which expresses a compensation value placed on physician services by CMS, which varies with the level of intensity of the service provided by a physician).

27.     The amount Dr. Pippas (and other physicians employed by JBACC) is paid for each wRVU depends upon the level of service he provides, which in turn is generally based upon determinations made by CMS about the complexity of medical decision-making involved and rough estimates of the amount of time a physician must spend with a patient to address the level of complexity of the patient's medical condition.  In other words, Dr. Pippas is paid more by JBACC if his services are billed to Medicare and other third party payors at a higher CPT Code (CPT codes are designations developed by the AMA and used by Medicare and other payors to denote the service provided by a physician).

28.     For example, if Dr. Pippas sees a patient in his office and that office visit is billed at a level 99212 (which involves fairly straightforward medical decision-making and a moderate amount of time spent with a patient) he is paid approximately $40 by JBACC.  But if Dr. Pippas bills an office visit at the level 99215, which represents the most complex medical decision-making and a substantial amount of time spent with a patient) he is paid approximately four times as much by JBACC, or approximately $160.  This clearly provides an incentive for Dr. Pippas to bill his office visits at the highest CPT code to increase his compensation.  In addition to being paid a base compensation for his wRVUs, Dr. Pippas has also, at all times since March, 2009, been paid a stipend of

$300,000 for serving as Medical Director of JBACC ($200,000) and as Director of Clinical Research for JBACC ($100,000).

29.    At all times relevant to this Complaint, CRHS recognized that its relationship with Dr. Pippas, and other employed and contracted physicians, was governed by the Stark Law and the Anti-kickback Statute, and that those statutes required physician compensation to be at FMV and to be commercially reasonable. Although CRHS understood that it was required to pay FMV for the services of its employed physicians, it did not do so in practice, particularly in the case of Dr. Pippas, but also in the case of other medical oncologists, including Dr. Bassett and Dr. Jiang.  CRHS at all times justified their decision to pay Dr. Pippas above FMV as based upon his "productivity," that is, the very large patient case load he carried.

30.    Dr. Pippas was, at all times relevant to this Complaint, paid by CRHS well in excess of the revenue CRHS received for the services he personally performed (at all relevant times, Dr. Pippas was paid at least twice of the collections CRHS received for his personally performed services), paid for services he did not personally perform, and allowed to increase his compensation by significantly and fraudulently up-coding the billing level for services he did personally perform in order to increase his compensation. The only way his excessive compensation makes sense is if CRHS determined his compensation by indirectly calculating the financial benefits to CRHS of the DHS Dr. Pippas

referred to that Defendant. This is a factor to which Dr. Pippas himself directly alluded in his 2013 compensation discussions (*see infra* at Paragraphs 22-26) with CRHS. Dr. Pippas defended his excessive compensation, saying that as his referrals of DHS to CRHS was in the millions of dollars, he believed he was being under-compensated, not over-compensated.

31.   In November, 2008, CRHS obtained a FMV analysis for Dr. Pippas' compensation from Integrated Healthcare Strategies ("IHS"), a leading consulting group in the arena of physician compensation and fair market value. CRHS' decision to obtain this report is evidence that it knew that Dr. Pippas' compensation was governed by FMV principles under the Stark Law and AKS. That report which was based upon the assumption that Dr. Pippas was paid only for services he personally performed, concluded that Dr. Pippas was being paid at the 90th percentile of medical oncologist's nationally, a level of compensation that in and of itself represents excessive compensation according to CMS. In 2008, Dr. Pippas was paid in excess of $1.6 million, well above the national average salary for medical oncologists of $300,000 to $500,000 annually. IHS, however, concluded that this level of compensation was reasonable, based upon Dr. Pippas' "consistent historical level of production since 2003." That "consistent historical level of production" included services that were rendered not by Dr. Pippas, but by

other physicians and non-physician providers employed by CRHS and utilized by Dr. Pippas to provide health care services to his patients.

32.     In early 2009, CRHS again obtained a FMV of Dr. Pippas' compensation from Oncology Solutions.  That report noted that "when applying the first 6 months of FY 2009 productivity for Dr. Pippas, it would appear that IHS has projected that Dr. Pippas would exceed $1.5 million in total compensation . . . [t]his is above all established benchmarks . . . the MGMA 2008 Report suggests that for single specialty hematology/oncology practices, the 90th percentile compensation is $1,268,349."  The report went on to note that "[b]ased on Oncology Solutions' experience in working with other practices, it is clear that Dr. Pippas is extremely productive.  However, the IRS rules regarding physician compensation being "reasonable" is at question whenever compensation is significantly over the 90th percentile. . . ."  Oncology Solutions recommended a reduction in the WRVU conversion factor from the current rate of $113.67 per wRVU.

33.     Despite the fact that the wRVU conversion factor was lowered to $90 per wRVU, Dr. Pippas continued over the next few years, to be paid at or above the 90th percentile of medical oncologists' compensation nationwide.  CRHS does not appear to have performed any FMV assessment of Dr. Pippas' compensation between the 2009 report and a report that was prepared in March 2013, when Dr.

Pippas' compensation came under scrutiny with CRHS.  During the years at issue in this Complaint, Dr. Pippas was paid: in 2007: $1.742 million; in 2008: $1.698 million; in 2009: $1.635 million; in 2010: $1.564 million; in 2011: $1.508 million and in 2012 and 2013 approximately $1.5 million.

34.     Neither the report by IHS or Oncology Solutions, evaluated whether Dr. Pippas' compensation was "commercially reasonable," *i.e.*, whether it would make commercial sense for CRHS to pay Dr. Pippas a salary at or above the 90th percentile in the absence of referrals to CRHS.  As noted, the fact that Dr. Pippas was consistently paid well in excess of the amount CRHS collected from third party payors on his behalf for his personally performed services raises serious questions about how this level of compensation could be commercially reasonable without indirectly taking into account the volume or value of his DHS referrals to CRHS.  For example, in FY 2006 (which runs from July 1, 2005 to June 30, 2006) Dr. Pippas was paid $876,272 based upon his wRVUs (in addition he was paid a stipend for medical director duties) but CRHS collected only $611,585 for his personally performed services.  That reflects compensation that is approximately forty percent higher than his income from personally performed services.

35.     The Plaintiff/Relator became aware, shortly after he was employed by JBACC as Administrative Director that Dr. Pippas was being paid for work he did not personally perform in violation of Stark, the AKS and FMV principles.  Mr.

Barker became aware, in late 2011 or early 2012, that Dr. Pippas was being paid based upon wRVUs generated by another physician, Dr. Rodriguez, who worked at JBACC helping Dr. Pippas with his case load. Although Dr. Rodriguez had his own provider number with Medicare, his patients were being billed to Medicare (and other payors) under Dr. Pippas' provider number. Not only was this a violation of Medicare regulations, but it also resulted in inflating Dr. Pippas' compensation by crediting him with wRVUs that were not attributable to his personally performed services.

36.     Mr. Barker also became aware that CRHS had been told in January of 2007 that this practice was improper during the course of an audit by Gates, Moore & Company ("Gates Moore"). The audit report issued by Gates Moore addresses this issue, saying unequivocally that "[t]here are no circumstances under which a physician's charges can be billed "incident to" another physician except under a local tenens arrangement, which this situation does not qualify for. Therefore, we recommend that you discontinue billing Doctor Rodriquez' charges under Doctor Pippas and begin billing his services under his own provider number immediately." The Gates Moore report went on to say that as "the claims filed using Doctor Pippas' provider number for Doctor Rodriquez' services were not appropriate, CRHS may need to review and refund to Medicare and/or Medicaid any collections obtained in this matter."

37.    Despite this unequivocal warning received in early 2007, CRHS continued to allow Dr. Pippas to bill for Dr. Rodriguez' work and to receive credit under this compensation plan for Dr. Rodriguez' wRVUs from at least 2007 up until April of 2013.  In January 2008, Renee Sturkie, then an internal auditor for CRHS noted in an email to Andrew Morley, M.D., the Chief Medical Officer for The Medical Center, and others that she was " [c]oncerned about the practice management and billing procedure being used by Dr. Rodriguez.  As I understand it, Dr. Rodriguez is expected to see patients for Dr. Pippas to serve as an 'extender.'  . . .  [i]n the past, Dr. Rodriguez would see patients, but then his services would be billed for under Dr. Pippas' provider number.   The clear understanding was that effective July 1, 2007, Dr. Rodriguez would see patients on his own and those patients would be billed directly under Dr. Rodriguez' provider number."

38.    However, as Ms. Sturkie recounts in this email, this practice did not end in July, 2007.  Instead "[w]e learned yesterday that Dr. Rodriguez is still seeing patients for Dr. Pippas and  . . . JBACC is still billing for those patients' consults under Dr. Pippas' provider number . . ."  Ms, Sturkie noted that Dr. Pippas was credited for wRVU purpose with 25% of the patients seen by Dr. Rodriguez.  Ms. Sturkie also noted, in this January 22, 2008 email that because of the use of and billing for Dr. Pippas' "physician extenders (which in addition to Dr.

19

Rodriquez included a nurse practitioner, Angela Dumbuya) "it is impossible to evaluate the number of patients Dr. Pippas is actually seeing himself . . ." As noted above, the fact that Dr. Pippas was being paid for work he did not personally perform raises concerns under the Stark Law about whether his compensation exceeded FMV. Dr. Pippas was also credited, for wRVU purposes with the work performed solely or largely by Karen Nelson, another non-physician provider.

39.     Larry Sanders, then CEO for CRHS responded to this email from Ms. Sturkie saying that "I cannot believe that we have allowed this to continue, especially with the specific requests I made following the consulting review made more than a year ago. This is simply inexcusable and must be corrected immediately. We may also need to explore the appropriateness of more formal correction of the issues contained herein to include possible self reporting of our oversight. Given Glenda Massee's involvement in the review of the issue a year ago and the discussions with the intermediaries, I just cannot see how this went unaddressed."

40.     The issue with Dr. Rodriguez was not the only compliance problem brought to CRHS management's attention about Dr. Pippas' excessive compensation in 2008. In September, 2008, Dr. Morley wrote an email to Mr. Sanders pointing out that in addition to the fact that CRHS was "fraudulently applying 25% of R [Rodriguez] [work] to P [Pippas]," Dr. Pippas' coding patterns

raised concerns that he was being overpaid because of his practice of "up-coding" his E & M visits.  Dr. Morley concluded from his review that "up-coding provides [Dr. Pippas] <u>54% more income</u> that [sic] normal distribution of coding" (emphasis added).  Dr. Morley noted that this was to be confirmed by an E & M coding analysis that Gates Moore was to undertake.

41.    In his September, 2008 email, Dr. Morley summarized the "major issues long term" with Dr. Pippas required an adjustment to his coding, a reduction in the RVU multiplier to 1.5 from 3 times the Medicare payment (as later recommended by IHS and Oncology Solutions), excluding Dr. Rodriguez' patients from Dr. Pippas' compensation.  Dr. Morley further recommended that CRHS "[r]e-think $300k for [medical director] stipend  This is significantly more than any other Medical Director and when combined with current salary calculations makes the issues from a total comp seem much worse."

42.    The issue regarding paying Dr. Pippas for the work done by his extenders was once again raised in October, 2009 by Matt Sherer.  "I am still not comfortable with us paying  Dr. Pippas for Angela [Dumbuya] and Dr. Rodriguez' RVUs.  Gates & Moore advised us against doing that . . ."

43.    Despite these warnings, Dr. Pippas' compensation continued to be based upon work performed by others and upon upcoded E & M billings through 2013.  In 2011, when Mr. Barker took over as Administrative Director of JBACC,

21

he became aware that Dr. Pippas had hundreds of patient files that had been billed to Medicare, Medicaid and other third party payors even though the documentation was incomplete and the documentation that did exist did not support the CPT levels billed. In 2012, CRHS commissioned a coding audit which included, among others, an audit of Dr. Pippas' charts. That audit was conducted by an outside auditor, Health Management Resources. It disclosed that Dr. Pippas had an error rate of 68%.

44.   Dr. Pippas reacted immediately and negatively to the coding audit and the resulting changes to his billings, concerned that his compensation would be negatively affected. Dr. Pippas openly told staff at JBACC that his codes, and his compensation, would be lowered "over his dead body." And, Dr. Pippas enlisted the help of a major donor and CRHS Board Member, Dan Amos, the CEO of AFLAC, to lobby on his behalf to prevent the erosion of his earning power that would result from accurate coding of his office visits.

45.   Because of the pressure brought to bear by Dr. Pippas and those acting on his behalf, and even though a comprehensive audit had confirmed that Dr. Pippas was significantly upcoding his E & M visits -- and that, correspondingly, he was being paid for work he had not actually performed -- CRHS continued to permit him, alone of all other physicians, to amend his documentation after the patient had been seen to justify the higher code for a

period of six months.  CRHS did this over the objections of Mr. Barker, who advised that amendments to chart were the exception, not the rule, used only to insure that the medical records included a piece of information that had not been available when the doctor initially saw the patient, such as a laboratory test result.'

46.     Although, as noted, concerns about Dr. Pippas being compensated for work performed by others was raised as early as 2007, it was not until 2013 that this practice finally ended.  In early 2013, Dr. Pippas raised concerns with the then CEO of CRHS, Chuck Stark, about his compensation for PTO (Paid Time Off), perhaps to make up for the fact that his overall compensation would decrease once he was no longer allowed to amend his E & M codes to bill at a higher level of service.  In any event, Dr. Pippas claimed that he was entitled to significant back pay for PTO.  That claim led to a complete review of Dr. Pippas' compensation structure, which included an assessment of whether Dr. Pippas' compensation was above FMV because he was paid for work performed by others.

47.     IHS was again asked to do a FMV assessment.  As CRHS CEO Stark informed the CRHS Board of Directors in February of 2013, IHS concluded that "the total wRVU production could not be solely attributable to Dr. Pippas but rather was the combination of all three providers (i.e. Dr. Pippas, Dr. Rodriguez and Angela Dumbuya [a Nurse Practitioner utilized by Dr. Pippas to see his patients] NP).  Accordingly, upon further review of an allocation of wRVUs

strictly attributable to Dr. Pippas' production, it was determined by Integrated Healthcare Strategies that <u>Dr. Pippas' compensation exceeds fair market value</u>." (emphasis added)  Finally, as a result of this study, in or about April, 2013, the practice of paying Dr. Pippas for the work of his assistants ended.  Of course, as the facts alleged above demonstrate, CRHS had known that Dr. Pippas compensation exceeded FMV on this basis since at least 2007 and ignored this fact to avoid losing Dr. Pippas and his huge DHS referrals.

48.    The FMV assessment performed by IHS in 2013 did not include an assessment of whether Dr. Pippas' compensation had exceeded FMV based upon his upcoding for the years prior to 2013 when CRHS finally implemented a system to prevent that abuse, ending the practice of allowing Dr. Pippas to amend his chart to justify a higher billing.  Logically, however, the same analysis of Dr. Pippas' previous compensation would lead to a determination that because he was paid for work that he did not personally perform, Dr. Pippas had always been paid in excess of FMV.   Internally, CRHS employees, including that organization's Chief Compliance Officer, Renee Archer,  recognized that this was a concern.  Ms. Archer expressed reservations  about the effect of Dr. Pippas' upcoding on the FMV calculations for his compensation, among other issues.

49.    In a note to the file written on January 24, 2013, Ms. Archer noted that "[t]he base compensation is an issue for me because I believe the 'impossible

24

day' as well as 'reasonableness test' needs to be considered . . . [t]his base compensation is based on an extremely high (higher than any other oncologist in the US) wRVU that we have information in which to question the accuracy . . . due to the following: currently the coder is lowering the E/M level of about 50 charts/week compared to the code initially assigned by Dr. Pippas . . ." This clearly shows that despite the coding audit and despite the fact that Dr. Pippas was no longer permitted to amend charts to justify a higher E & M code, there were justifiably, concerns that Dr. Pippas was being overpaid based upon upcoded charts as late as January 2013 because even then, only a fraction of his charts were being audited. While Dr. Pippas claimed to see in excess of <u>50 patients a day</u>, CRHS only assigned a coder to review <u>50 charts a week</u>. This meant that many office visits were still being billed to third party payors based upon Dr. Pippas' assignment of a code, without review by a coder.

50.     In this same file note, Ms. Archer also expressed concerns about Dr. Pippas' compensation on other grounds, saying that: "[t]he independent third party [IHS] had opined that they do not have any other client that is currently paying a physician in this specialty at the rate Dr. Pippas is being paid." Ms. Archer continues, saying that "[i]t is very difficult to support the idea that here in Columbus Ga. we have the top producer in the entire United States . . ."

51.     Ms. Archer's file note also reveals that she had checked records showing when Dr. Pippas was entering and leaving the Cancer Center and The Medical Center.  Those records showed that he was consistently working fewer than 5 days a week.  Ms. Archer noted that this meant that "now we have the top or second top wRVU producer in the country AND he is doing so in less than 5 days a week."  Ms. Archer concluded by saying "[i]f we question the validity of the RVU's [produced by Dr. Pippas] why would we allow his salary to be paid primary [sic] based on a formula that we suspect . . . I am not sure this would be defensible, even for employment pay . . ."

52.     While these violations of FMV to an employed physician were occurring, CRHS' CEO Chuck Stark lectured his directors in a May 9, 2013 email that "[w]e at Columbus Regional use outside firms to establish fair market value for all financial transactions involving physicians . . . [w]hen you don't use outside firms and follow their guidance on fair market value you find yourself in a lawsuit like the one described in the link below [referencing the *U.S. ex rel Drakeford v. Tuomey Hospital* case pending in Virginia] . . ."  Stark continued, saying that "Fair Market Value is the fundamental discussion we in management MUST be having in all of our discussions around compensating physicians . . whether they be medical directors, employees, or for contracted services as well as in our discussions regarding lease rent amounts and all other financial transactions

between persons in a position to influence referrals and CRHS." Mr. Stark wrote this memorandum at or near the time when he was meeting with the CRHS Board of Directors to consider the FMV of Dr. Pippas' compensation, a review that, as noted above, did not include a discussion about whether Dr. Pippas' compensation was artificially inflated by payment for upcoded office visits.

53.    In addition to concerns about the justification for Dr. Pippas' base compensation, concerns were also raised about his performance in his two Medical Director positions, for which he received an additional stipend of $300,000 per year. Mr. Barker was one of those who raised these concerns, noting shortly after he came on board as Administrative Director of the JBACC, in April 2012, that he "went back over Dr. Pippas' last two years of medical director logs and he has routinely logged anywhere from 60 to 80 hours per month." Mr. Barker noted that "[p]ersonally, I can't imagine what he's doing upwards of 20 hrs/wk, but that's your call." Ms. Archer also questioned Dr. Pippas' role as a medical director, saying in an April 19, 2012 email that Dr. Pippas and Pawloski (a hematologist who was also a medical director at JBACC) "appear to be Medical Directors over the same thing" and recommending that their separate duties be specifically spelled out.

54.    In fact, as noted, JBACC seemed extraordinarily "top heavy" in terms of the number of medical directors. Of the ten oncologists who saw patients in the

JBACC, four of them were medical directors or almost half of the doctors were medical directors, raising questions about whether the positions were really commercially reasonable and necessary to the running of the cancer center and whether they had duplicative and overlapping job duties.   Commercial reasonableness is a requirement of remuneration relationships under the Stark Law and the AKS.

55.   Internal communications within CRHS show that the organization was well aware of these commercial reasonableness considerations, which exist whether or not compensation is at FMV.  In September, 2012, Mr. Stark forwarded an article to his top executives that had appeared on the internet, which was entitled "13 Key Questions for Hospital Physician Relationships – Assessing Legal Compliance."  Among the "13 Questions" were many that raised the commercial reasonableness question, including whether the relationship is truly needed, whether similar positions are offered in other specializations that are less richly reimbursed, whether the relationship has been approved by independent parties, and whether there is a written justification for the true need for the relationship.  In Dr. Pippas' case, none of these requirements had been met.  There was, for example, no written justification for the relationship at all, much less one that was periodically reviewed to determine a continuing need.

28

56.    Dr. Pippas' compensation relationship is far from unique within CRHS in terms of compliance with requirements of the Stark Law.  Dr. Bassett is also among the top-paid employed physicians within JBACC.  The HMR audits referenced above showed that he also was paid based upon fraudulent assumptions about his productivity, with an error rate of 63%.  It was well known within JBACC that Dr. Bassett almost always billed his E & M visits at the highest level (at a 99215) which, as described above, significantly increased his compensation.

57.    And, during Mr. Barker's tenure at CRHS many other physician relationships were found by internal auditors, Ms. Archer or Mr. Stark, to be non-compliant with Stark exceptions, even though a remuneration relationship existed. In February, 2012, Ms. Archer and Mr. Stark met and reviewed a list of a half dozen potential Stark violations, including medical director agreements under which flat payments instead of hourly payments were being made to physicians, medical directors being paid with no timesheets to justify payments, contracts for which no annual review of commercial reasonableness had taken place, physicians who were being paid more than provided by their contracts, issues relating to shared payments for the CEO of the Columbus Clinic, and expired leases and uncollected rents that went back years.

58.    Another internal document, authored in July 2012, listed a total of nineteen potential Stark violations, including an issue relating to pediatricians who

29

were being paid without a contract; a physician (a Dr. Motiwala) who was being paid despite the fact that his contract had expired two years earlier; another physician (Dr. Trenga) who was being paid in excess of the compensation set forth in his contract; paying two medical directors for the same service (Dr. Basset and Dr. Clepper, for clinical laboratory services at JBACC); expired lease agreements, going back to 2008 and 2009; uncollected rent payments totaling $153,592; a lease agreement with the Pediatric After Hours clinic that provided managerial services at no cost and was not based upon FMV rent payments and permitted other doctors to use the space free of charge; hospitalist contracts that had expired and/or were being paid outside of contract terms; a lease with the Columbus Clinic that had a twenty year term and no rent escalator clause, making the rent payments below FMV; and the relationship with the Director of the Columbus Clinic who was paid by CRHS but managed a group of physicians; and a contract with a physician (Dr. Patton) which had expired in 2008, but payments to Dr. Patton had continued.

59.     With respect to the expired lease agreements the author concluded that 'will probably have to refund money to CMS for DHS referral of Medicare/Medicaid patients made by physicians with expired lease agreements for the time period we were without a current lease agreement." But for the vast majority of these apparent Stark violations, the author, and apparently CRHS itself, concluded that no self reporting was necessary because the relationship

30

"potentially" fit within a Stark exception even though it did not actually do so because it lacked a written agreement, a FMV payment or was not commercially reasonable. The widespread violations show that CRHS acted in reckless disregard of the Stark Law.

60.    These events occurred while the CRHS CEO Chuck Stark was fully aware of these violations and at a time when he wrote to his senior staff in October, 2009, advising them that "you cannot pay a physician without a contract unless you are willing to go to jail." Mr. Stark also noted that "you should only pay physicians according to the contracted terms . . to pay them more than what is stipulated in the contract is to subject yourself to possible jail time, civil monetary penalties and the loss of your job.' Mr. Stark noted that "to make sure there is no confusion, you and your directors cannot process timesheets for payment of medical director services unless the services were performed at the request of the director or yourself . . . to pay otherwise is to subject you directors and yourselves to scrutiny by the OIG and possible civil monetary penalties and jail time if it determined that the payments were intended to influence current or future business referrals." Mr. Stark concluded saying that "[t]his is serious stuff so let's make sure there are no questions."

61.    As part of his duties as Administrative Director of the JBACC, Mr. Barker was privy to claims and billing data which showed the extent to which

CRHS and JBACC billed Medicare and Medicaid for DHS referred to CRHS by Dr. Pippas. That data shows that between 2008 and mid-2013 CRHS submitted a total of $ 138,994,307 in charges to Medicare and Medicaid for claims as to which Dr. Pippas was the referring physician. (Medicare reimbursement averaged approximately 27.4% of total charges during the time period relevant to this Complaint; Medicaid reimbursement averaged approximately 34.4% of total charges during the relevant time period.) A very small percentage of these charges – less than 15% -- reflect charges for E & M services that Dr. Pippas personally performed. The remaining approximately 90% includes charges for other DHS as to which Dr. Pippas is listed as the referring physician but which he did not personally perform, including but not limited to inpatient hospital admissions and chemotherapy infusion services. Mr. Barker knows that CRHS upper management, up to and including the CEO of CRHS kept track of these referrals, and the resulting profit (contribution) to CRHS for Dr. Pippas and considered them in making financial decisions relating to Dr. Pippas, including in determining the appropriate level of CRHS' investment in his medical oncology practice.

## COUNT I
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A) (2009)
### (Presenting or Causing Presentment of a False Claim)

62.    Plaintiff/Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

63.     By virtue of the acts described above, Defendant knowingly violated the Stark Law and knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

64.     By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

**COUNT II**
**FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729(a)(1)(B)**
**(Knowingly Presenting a False or Fraudulent Record)**

65.     Plaintiff/Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

66.     By virtue of the acts described above, Defendant knowingly violated the Stark Law and knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(b), presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(b).

67.     By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble

33

damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

**COUNT III**
**FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729(a)(1)(A) (2009)**
**(Presenting or Causing Presentment of a False Claim)**

68.   Plaintiff/Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

69.   By virtue of the acts described above, Defendant knowingly violated the Anti-kickback Statute and knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

70.   By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

**COUNT IV**
**FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729(a)(1)(B)**
**(Knowingly Presenting a False or Fraudulent Record)**

71.   Plaintiff/Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

72.     By virtue of the acts described above, Defendant knowingly violated the Anti-kickback Statute and knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(b), presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(b).

73.     By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

## COUNT V
## GEORGIA FALSE CLAIMS ACT
## GEORGIA CODE § 49-4- 168.1

74.     Plaintiff/Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

75.     By virtue of the acts described above, Defendant knowingly made or caused to be made a false statement or misrepresentation for use in determining rights to a benefit or payment under the Georgia Medicaid Program.   GEORGIA CODE. § 49-4-168.1.

76.     By virtue of the false records or false statements caused to be made by Defendants, the State of Georgia suffered damages and therefore is entitled to

treble damages under the Georgia False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff United States of America demands that judgment be entered in its favor and against the Defendants as follows:

A.     On Count I (Presenting or Causing Presentment of False Claims), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial;

B.     On Count II (Knowingly Presenting A False Or Fraudulent Record), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial;

C.     On Count III (False Record to Avoid an Obligation to Refund), judgment against the Defendants for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial.

WHEREFORE, Plaintiff the State of Georgia demands that judgment be entered in its favor and against the Defendants as follows:

D.     On Count IV(Knowingly Making a False Statement in Connection with Determining Right to Payment),  judgment against the Defendants for treble damages as further established at trial plus a penalty of $10,000 per false claim as

established at trial.

## PRAYER FOR A JURY TRIAL

The United States of America and Plaintiff/Relator prays a jury trial in this action.

Respectfully submitted,

By: _____

Andrea Solomon Hirsch
Georgia Bar No. 666557
**HERMAN GEREL, LLP**
230 Peachtree Street, NW
Suite 2260
Atlanta, GA 30303
Telephone: (404) 880-9500
Fax: (404) 880-9605
Ahirsch@hermanmathis.com


Jamie M. Bennett, Esq.
Admitted *Pro Hac Vice*
**ASHCRAFT & GEREL, LLP**
4301 Garden City Drive
Suite 301
Landover, MD 20785
Telephone: (301) 459-8400
Fax: (301) 459-1364
jbennett@ashcraftlaw.com


*Attorneys for Plaintiff/Relator Richard Barker*